Below is an opinion of the court.

*Teresa H. Pearson*
_____
TERESA H. PEARSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 22-31202-thp13 |
| JOHN FRANKLIN FRYSINGER, | MEMORANDUM OF DECISION[1] |
| Debtor. | |

This matter came before the court on confirmation of debtor John Franklin Frysinger's First Amended Chapter 13 Plan dated 11/30/2022 (ECF No. 36, the "Plan"). Creditor Shannon Legg objected to confirmation of the Plan and moved to dismiss the case (ECF No. 37). Although the chapter 13 trustee had objected to debtor's initial plan, the chapter 13 trustee's counsel reported that the trustee's objections have been resolved.

The court held an evidentiary hearing on confirmation of the Plan on February 1, 2023. Mr. Frysinger appeared with his counsel Laura Donaldson, Ms. Legg appeared with her counsel Arnold Wuhrman, and the trustee appeared through his counsel Jordan Hantmann. After considering the testimony presented and exhibits admitted into evidence, the court makes findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this case by Fed. R. Bankr. P. 7052 and 9014(c).

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

## **Findings of Fact**

1.      Mr. Frysinger filed his voluntary petition under chapter 13 on July 26, 2022.  He filed his bankruptcy schedules, statement of financial affairs, and initial chapter 13 plan on August 8, 2022.  The only sources of income that Mr. Frysinger listed on his Schedule I were distributions of $3,800 per month from a personal injury settlement, and proposed income of $200 per month from miscellaneous sales.  On Schedule J, Mr. Frysinger reported $3,800 in monthly expenses, including $180 for transportation expenses and $0 for medical expenses.

2.      Before Mr. Frysinger filed his bankruptcy petition, he already received all the personal injury settlement distributions he was entitled to receive.  Mr. Frysinger was not entitled to receive any payments from the personal injury settlement post-petition.

3.      In his briefing regarding his eligibility to be a debtor under chapter 13, Mr. Frysinger asserted that he intended to use his bank account holding the personal injury proceeds to fund his case, and, when those funds were exhausted, to withdraw funds from his Individual Retirement Accounts (IRAs) to pay his monthly plan payments.

4.      Mr. Frysinger had scheduled several IRAs, holding approximately $67,800, on his Schedule B, and he exempted those accounts on his Schedule C.  Although withdrawals from the IRAs were not listed as a source of income on his Schedule I, Mr. Frysinger filed a declaration saying that he intended to use withdrawals from his IRAs to pay his chapter 13 plan payment and fund his ongoing monthly expenses until he finds regular employment.

5.      Mr. Frysinger is 60 years old and can withdraw funds from his IRAs without incurring a tax penalty.

6.      In a prior opinion, the court determined that Mr. Frysinger was eligible to be a debtor in chapter 13, but reserved issues of good faith and feasibility for future proceedings.

7.      On December 1, 2022, Mr. Frysinger amended his Schedules I and J.  On the amended Schedule I, he reported employment providing elder care for Circle of Care Caregiving, Inc. ("Circle of Care"), with monthly wages of $3,000 per month.  He reported other

monthly income of $1,150 from Uber/Lyft driving. He also reported income of $800 from pension or retirement income (presumably funds he was withdrawing from the IRAs). Mr. Frysinger no longer included income of $200 per month from miscellaneous sales. Schedule J did not change.

8. On December 27, 2022, Mr. Frysinger amended his Schedules I and J again. The only change on Schedule I was to clarify that Mr. Frysinger's relationship with Circle of Care Caregiving, Inc., was as an independent contractor and not an employee, as that relationship had been inadvertently[2] reported in the wrong place on the prior form. Schedule J did not change.

9. At the time of filing, Mr. Frysinger was not employed, and did not receive unemployment compensation.

10. In the past, Mr. Frysinger worked for approximately 20 years as a computer enterprise architect, primarily for his own company, 360 Systems, Inc. That company stopped regular operations in or before 2015 and last received revenue in or before 2016. Mr. Frysinger has not had steady employment since that time.

11. In 2020, Mr. Frysinger and Ms. Legg were divorced. They agreed upon the terms of a Marital Settlement Agreement on September 3, 2020, which was incorporated into a General Judgment of Dissolution (Stipulated) entered in the state court shortly thereafter.

12. In the dissolution judgment, Mr. Frysinger and Ms. Legg each were awarded custody of their minor child 50% of the time, and each were expected to provide 50% of the child's support. Although Mr. Frysinger was unemployed at the time, his income was imputed to be the same amount as Ms. Legg's income. As a result, Mr. Frysinger was not required to pay child support.

---

[2] The court accepts that this was an inadvertent error. This error had no impact on the outcome of this case.

13.     In November 2021, Ms. Legg filed a motion with the state court to modify the dissolution judgment.  Specifically, Ms. Legg wanted to require Mr. Frysinger to start paying child support.

14.     On June 27, 2022, Mr. Frysinger filed a Uniform Support Declaration in opposition to Ms. Legg's motion, opposing any obligation to pay child support.  Among other arguments, Mr. Frysinger submitted financial information and his Rebuttals to Any Proposed Support Calculations.  Relevant to this matter, Mr. Frysinger stated in his Declaration:

> Income: Imputed to minimum wage at the highest. Respondent [Mr. Frysinger] is in a unique situation that makes his income potential very difficult to assess with accuracy.
>
> * * *
>
> Respondent has been unemployed for approximately 8 years despite strong efforts in a number of different approaches to gain employment. There are a number of contributing factors to the length of time and difficulty of Respondent's attempt to be employed. These have included an especially severe impact by covid on Respondent's profession, industry, and position. They have al;so [sic] included a number of back to back events long recognized as high stress and having a high level of impact on an individuals ability to function. However, the largest issue by far has been Respondent's struggle with high impact mental health problems several which will not abate. These are the main source of the difficulty and struggle Respondent has with employment. The individual diagnosis are adult ADHSD, Bipolar Disorder Major Episode Depression, and Acute Anxiety including severe short-term anxiety. Respondent is under medical and therapeutic care for these including both medication and therapy. Additional information has been prepared as exhibits if these Rebuttals are required.

This declaration was filed with the state court less than one month before Mr. Frysinger filed this bankruptcy case.

15.     In early July, 2022, Mr. Frysinger appeared at the state court hearing to oppose the increase in child support.  He brought medical records from Dr. Dan Quiggens to use as an exhibit if necessary.  Dr. Quiggens' records supported Mr. Frysinger's assertions regarding his diagnoses and inability to obtain work.  Dr. Quiggens is a licensed clinical psychologist, who had treated not only Mr. Frysinger, but other members of the family.  As a result, Ms. Legg

trusted Dr. Quiggens' assessment, and ultimately did not present a prima facie case to support a change in Mr. Frysinger's child support obligations.

16.     The Marital Settlement Agreement, in section five on Taxes, contained extensive provisions regarding Mr. Frysinger and Ms. Legg's tax liabilities.  To summarize the key terms relevant to this proceeding, the word "Taxes" is defined broadly, and includes any obligations relating to the 2018 and 2019 joint tax returns.  Mr. Frysinger unconditionally agreed to indemnify and hold Ms. Legg harmless from any tax liability in excess of $10,000.
Mr. Frysinger and Ms. Legg further agreed to share equally in any liability for the 2018 and 2019 joint tax returns.  For purposes of these specific taxes only, they removed the $10,000 limit on Ms. Legg's liability.  Although they could have done so, they did not limit Mr. Frysinger's obligation to indemnify and hold Ms. Legg harmless from all tax liabilities for the 2018 and 2019 joint tax returns in excess of her share.  This language is unambiguous.  Thus, Mr. Frysinger has an obligation to indemnify Ms. Legg for any amount she pays the Internal Revenue Service above her 50% share of the 2018 and 2019 joint tax liabilities.

17.     On January 6, 2022, Ms. Legg sought an order to show cause why Mr. Frysinger should not be held in contempt of the dissolution judgment for failure to pay his share of the 2018 joint tax obligations and to file the 2019 joint tax returns.  Ms. Legg also sought relief allowing her or a third party to sign and file tax returns for 360 Systems, Inc., because Mr. Frysinger had not done so, and those tax returns might have generated losses that would offset some of the 2018 and 2019 joint personal tax liability.  The state court issued an order to show cause.

18.     On January 21, 2022, Mr. Frysinger entered into an installment payment agreement with the Internal Revenue Service for the 2018 taxes.  This agreement required Mr. Frysinger to pay the Internal Revenue Service $450 per month.  Mr. Frysinger made only two installment payments pursuant to this agreement.  The Internal Revenue Service also offset Mr. Frysinger's 2021 tax refund against the amount due for the 2018 joint taxes.

19.     On March 7, 2022, Mr. Frysinger and Ms. Legg filed the 2019 joint tax return.  Shortly thereafter, Mr. Frysinger's required installment payment to the Internal Revenue Service doubled and Mr. Frysinger stopped making the installment payments.  The Internal Revenue Service contacted Mr. Frysinger, and he responded that he could not pay the increased amount.  In April 2022, the Internal Revenue Service declared the 2018 and 2019 taxes uncollectible due to hardship, which, as a practical matter, meant that the IRS would not try to collect those taxes, at least from Mr. Frysinger, for one year.

20.     After several postponements, the state court scheduled a hearing on contempt of court for July 27, 2022.  That hearing did not proceed after this case was filed on July 26, 2022, due to the automatic stay of 11 U.S.C. §362(a).

21.     According to her proof of claim, Ms. Legg has paid her half of the joint tax liability for 2018 and 2019, and has paid $1,620.84 of Mr. Frysinger's share of the tax liability.  Mr. Frysinger and Ms. Legg are jointly liable to the Internal Revenue Service for the 2018 and 2019 taxes.  As a result, Ms. Legg retains exposure to collection from the Internal Revenue Service for Mr. Frysinger's share of these taxes.  In her proof of claim, Ms. Legg asserts a claim for the $1,620.84 she has paid of Mr. Frysinger's share, her rights to indemnity under the Marital Settlement Agreement for any presently-unliquidated amount she may have to pay to the Internal Revenue Service for those taxes in the future, and attorney fees.

22.     From the time he filed bankruptcy to the confirmation hearing on February 1, 2023, a period of over six months, Mr. Frysinger sought employment in the technology field.  He was unable to obtain such employment because his skills are out of date with current platforms.  Mr. Frysinger intends to update his skills and continue to search for work in the technology field.

23.     On November 28, 2022, Mr. Frysinger signed a Caregiver Registry Agreement with Circle of Care.

24.     Circle of Care is a referral service.  Under Circle of Care's business model, clients needing care contract directly with the caregiver, and provide a fee to Circle of

Care for the referral.  There is a lot of work available in the care-giving industry right now, as there are many potential clients needing care and not enough caregivers.  However, individual clients are free to interview and choose their caregivers from among the referrals provided by Circle of Care.  As a result, no individual caregiver is guaranteed a placement or any specific amount of work.

25.     Caregivers in Oregon are required to have certain training, the amount and nature of which depends on the type of services each individual caregiver provides.  In December 2022, Circle of Care provided some caregiving training to Mr. Frysinger.  Normally, Circle of Care would not pay one of its independent contractors to go through training. However, Circle of Care was willing to pay Mr. Frysinger for the time he spent training, because he agreed to do some administrative work for Circle of Care that included providing feedback to it on its training program and preparing training materials.  Circle of Care paid Mr. Frysinger $1,440.00 for this December work on December 23, 2022.  Mr. Frysinger also did 21 hours of training and administrative work for Circle of Care in the first week of January 2023, but as of the confirmation hearing had not yet been paid for these services.

26.     Circle of Care's owner said she could potentially have more administrative work for Mr. Frysinger to do, but she did not know how much that might be, as it would depend on Circle of Care's own financial resources and capacity.  There was no evidence that Mr. Frysinger had provided additional services to Circle of Care as of the time of the confirmation hearing, or that he had specific plans to do so in the future.

27.     By the time of the confirmation hearing, Mr. Frysinger had contracted to assist one client with caregiving on a part-time basis.  Mr. Frysinger did not provide any specific evidence on the terms of this contract or how much, if any, revenue he had received or would receive from this client.  However, Mr. Frysinger testified that he included terms in the contract he drafted to strictly limit his liability to the client.  As a result, Mr. Frysinger did not carry any liability insurance for his caregiving services.

28.     As of the time of the confirmation hearing, Mr. Frysinger had done no work for Uber or Lyft, although he had signed up with Lyft in December 2022.

29.     Mr. Frysinger anticipates that he will become eligible for Social Security benefits when he reaches age 62, and intends to obtain those benefits when he is eligible. He believes he will be able to receive $1,400 net per month starting in July 2024. His December 2022 statement from the Social Security Administration shows that his estimated monthly benefit at age 62 would be $1,697, but this does not account for any potential taxation of that income. Mr. Frysinger recognizes that he is not required to commit Social Security income to the Plan, but testified that he will use those funds to pay the Plan if he needs to do so.

30.     Mr. Frysinger presently obtains medical care through the Oregon Health Plan, a benefit provided to certain low-income Oregonians. If Mr. Frysinger's income rises to the level set forth in his most-recently amended Schedule I, Mr. Frysinger will no longer qualify for this medical coverage.

31.     Mr. Frysinger withdrew $3,685.10 from his IRA cash management account in December 2022. Post-petition, Mr. Frysinger withdrew $8,800 from his IRA portfolio account, $500 of which was withdrawn in December 2022.

32.     In his Plan, Mr. Frysinger proposes to make payments for approximately 60 months, even though his applicable commitment period is 36 months. He proposes to make three monthly payments of $200, eighteen monthly payments of $400, and the remaining monthly payments of $850. The Plan payments will be applied to payment of priority claims and administrative expenses (trustee's fees and attorney fees). No payment is anticipated to unsecured creditors.

33.     Mr. Frysinger was current on his Plan payments as of the confirmation hearing on the Plan.

**<u>Conclusions of Law</u>**

"For a court to confirm a plan, each of the requirements of section 1325 must be present and the debtor has the burden of proving that each element has been met." *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443-44 (9th Cir. 1986).

### A. Feasibility

Section 1325(a)(6) provides as a condition of plan confirmation the court must find that "the debtor will be able to make all payments under the plan and to comply with the plan." Based on the record, and the findings of fact set forth above, the court cannot make this finding about the Plan.

First, the court is not persuaded that Mr. Frysinger will have sufficient income over the next five years to fund both his reasonably necessary living expenses and the Plan. The IRAs and future Social Security income alone, while helpful, are not sufficient. Mr. Frysinger would also need to work to generate enough income to fund the Plan.

Mr. Frysinger has not held steady full-time employment since at least 2015. The month before his bankruptcy filing, he submitted a declaration to the state court saying his income potential was very difficult to assess with accuracy due to persistent unemployment despite strong efforts to become employed. He attributed this condition to substantial medical issues that would not abate.

Although Mr. Frysinger has earned some sporadic income as an independent contractor during the six months that passed between filing his petition and the confirmation hearing, he did not have steady work during that time.

While the evidence shows Mr. Frysinger may continue to have sporadic work as a caregiver in the future, it does not show Mr. Frysinger could and would obtain enough steady work to generate sufficient income to fund both his living expenses and Plan payments. Mr. Frysinger's medical conditions have affected his past ability to work, and he did not provide any evidence that his medical condition has improved. Although Mr. Frysinger intends to update his skills and continue seeking technology work, this will take time. Mr. Frysinger's income

from Uber/Lyft is entirely speculative, as he has not yet done any such work at all. In his Schedule I, Mr. Frysinger's proposed income from Uber/Lyft is only an estimate based on information from Uber's website and driver forums on the internet.

The fact that Mr. Frysinger is current on his Plan payments does not change the court's conclusion. Mr. Frysinger was able to make those payments because he withdrew far more funds from his IRAs post-petition than was anticipated on his most recent Schedule J. While Mr. Frysinger is free to use his exempt IRAs as he chooses, the IRAs are not an unlimited resource.

Second, the court is also not persuaded Mr. Frysinger has made adequate allowances for the risks and expenses he would incur in earning income. Mr. Frysinger proposes to be an independent contractor providing caregiving and driving for Uber/Lyft. However, there are several unaccounted expenses he would incur in earning such income:

- Income taxes and self-employment taxes. While Mr. Frysinger includes some taxes on his second amended Schedule I for his caregiving work, it is unclear whether he included a sufficient amount for caregiving, and he includes no allowances for taxes on the work he does for Uber/Lyft. Mr. Frysinger believes he can lower his self-employment taxes by using a corporate structure but has not yet formed any corporate entity.

- Transportation expenses. Mr. Frysinger proposes that his transportation expenses will be only $180 per month. As a caregiver, he is expected to travel to the client's home, and as an Uber/Lyft driver, Mr. Frysinger would be doing a lot of driving. Yet, this proposed transportation expense is exactly the same as the amount Mr. Frysinger proposed in his initial budget for transportation, when he was unemployed at home before contemplating doing caregiving work or driving for Uber/Lyft.

- Insurance. Mr. Fryinger does not maintain any liability insurance for his caregiving work, even though this work is with a vulnerable population.

Mr. Frysinger's contract with Circle of Care contains an indemnity obligation if it is named as a defendant in connection with any caregiving work Mr. Frysinger performs. He has no means of reimbursing Circle of Care for any such indemnity obligation.

- Medical and dental expenses. Mr. Frysinger's budget contains no amounts for medical care. Mr. Frysinger testified that was because he is presently covered by the Oregon Health Plan. However, Mr. Frysinger will lose Oregon Health Plan coverage if his income increases to the level set forth in Schedule I. Given Mr. Frysinger's admitted significant medical issues, a zero budget for medical expenses is facially unreasonable. The court has insufficient evidence to find that Mr. Frysinger could simply stop taking his medication and still perform under the Plan.

Mr. Frysinger asserted that he could adjust his budget to account for all these expenses, and write contracts with his caregiving clients to eliminate his risks. While some expenses in Mr. Frysinger's budget perhaps could be limited or eliminated, the court is not persuaded Mr. Frysinger's budget could be adjusted sufficiently to account for all the unaccounted expenses and still provide for a feasible plan. Mr. Frysinger may be able to limit some of his risk with caregiving clients contractually, but he is unlikely to be able to eliminate all risk of claims (whether such claims would be meritorious or not).

## B. Good Faith

As a condition of plan confirmation, the court is required to find "the plan has been proposed in good faith and not by any means forbidden by law" under section 1325(a)(3) and "the action of the debtor in filing the petition was in good faith" under section 1325(a)(7). Based on the record, and the findings of fact set forth above, the court cannot make this finding.

The Ninth Circuit Court of Appeals requires the court to consider the totality of the circumstances to determine good faith. The court should consider several factors, including (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the

Bankruptcy Code, or otherwise filed his chapter 13 petition or plan in an inequitable manner, (2) the debtor's history of filings and dismissals, (3) whether the debtor only intended to defeat state court litigation, and (4) whether egregious behavior is present. The court is not required to find fraudulent intent by the debtor. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999); *Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 851 (9th Cir. BAP 2012), *aff'd*, 711 F.3d 1120, 1127-30 (9th Cir. 2013). The court will address these factors in reverse order.

With respect to the fourth factor, Mr. Frysinger did engage in egregious behavior. When Mr. Frysinger wanted to evade an obligation to pay child support, he filed a declaration with the state court indicating his employment prospects were dim given his significant and on-going mental health issues and long-term trouble finding work. Less than a month later, he filed this chapter 13 case, and is now trying to convince this court of exactly the opposite—that he will be able to make sufficient income from working to fund his reasonably necessary living expenses and Plan payments. Mr. Frysinger provides no convincing explanation for taking these differing positions with differing courts so close in time.

With respect to the third factor, there is no question that this case was filed to defeat state court litigation. This case was filed on the eve of a state court hearing regarding whether Mr. Frysinger should be held in contempt for failure to comply with the dissolution judgment.

With respect to the second factor, there is no evidence that Mr. Frysinger has filed bankruptcy before.

With respect to the first factor, Mr. Frysinger misrepresented his income in his initial Schedule I. That schedule showed he would have monthly income from a personal injury settlement when in fact he had already received all the settlement proceeds prepetition. While Mr. Frysinger may have made an innocent mistake in listing this asset as income, Mr. Frysinger also knew these were not an on-going source of monthly income, and he had already received and held in an account the remaining proceeds of all the payments he was entitled to receive. Although Mr. Frysinger's IRAs could provide a source of regular income, he knew how much

was in those accounts. Mr. Frysinger should have known that his existing accounts were insufficient to fund both his reasonably necessary living expenses and his Plan. Mr. Frysinger also knew he had long-term difficulty finding steady employment. Essentially, at the time he filed this case, Mr. Frysinger knew or should have known that he did not have the income necessary to fund a chapter 13 plan.

Under these specific factual circumstances, by choosing to file under chapter 13 instead of chapter 7, Mr. Frysinger was attempting to unfairly manipulate the Bankruptcy Code. Mr. Frysinger could have filed a chapter 7 case in good faith—chapter 7 has no income requirement and Mr. Frysinger was in actual financial distress, owing substantial credit card, tax, and other debt.

Instead, Mr. Frysinger filed under chapter 13, even though he knew or should have known that he did not have sufficient income to pay for both his reasonably necessary expenses and Plan payments. When asked at the confirmation hearing about his reason for filing chapter 13, Mr. Frysinger asserted that he chose to file chapter 13 instead of chapter 7 to protect $5,256 of his non-exempt assets. The court does not find that credible, particularly given he would incur higher attorney fees in chapter 13 than in chapter 7.

It is apparent that Mr. Frysinger filed chapter 13 to evade his obligations to pay Ms. Legg's claim for indemnity. Although Mr. Frysinger disputes liability for these claims under the terms of the Marital Settlement Agreement, the Marital Settlement Agreement is not ambiguous and the indemnity obligation is owed. The obligation was incurred in the course of a divorce. In a chapter 7 case, Ms. Legg's claim would not be dischargeable under 11 U.S.C. §523(a)(15), but in a chapter 13 case, Ms. Legg's claim would be dischargeable under 11 U.S.C. §1328. The Plan provides for no payment on Ms. Legg's claim, as no payment is anticipated to any general unsecured creditor. While ordinarily a debtor is free to choose whichever chapter they are eligible to file, under the facts of this case, the court finds Mr. Frysinger's choice of chapter 13 to be inequitable.

Considering the totality of the circumstances, the court cannot find good faith.

### **Conclusion**

For the reasons set forth above, the court denies confirmation of the Plan. The court will enter an order dismissing Mr. Frysinger's case within 28 days of the date of the order, unless, prior to that time, Mr. Frysinger files a motion to convert the case to chapter 7.

# # #